**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| KENNETH PRIDDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:17-CV-000456-HAB |
| | ) | |
| ATLANTIC SPECIALTY INSURANCE | ) | |
| COMPANY and BRENTWOOD | ) | |
| SERVICES ADMINISTRATORS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This case comes before the Court following a series of unfortunate events resulting in the Plaintiff's serious injury and leading to the instant insurance coverage dispute. Before the Court is Defendants, Atlantic Specialty Insurance Company ("ASIC") and Brentwood Services Administrators, Inc.'s ("Brentwood"), Motion for Summary Judgment filed on February 3, 2020. (ECF No. 31.) Plaintiff, Kenneth Priddy ("Priddy"), responded in opposition on March 24, 2020, to which the Defendants replied. Along with their reply, Defendants filed a Motion to Strike certain evidence relied upon by Priddy in his response (ECF No. 41), and a request for oral argument on their motions (ECF No. 43). For the following reasons, the Motion for Summary Judgment will be DENIED in part and GRANTED in part.  The remaining motions will be DENIED.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## FACTUAL BACKGROUND

With few exceptions, the parties are in agreement as to the underlying facts. Where facts are disputed, the Court, as it must, will resolve the disputes in Priddy's favor as he is the non-movant. Mindful of this, the facts are as follows:

### A.  The Accident

At the time of the events giving rise to this lawsuit, Priddy was a full-time over-the-road truck driver working under an independent contractor agreement with Combined Transported Systems, LLC, ("Combined"). (Dep. of Kenneth Priddy at 14, ECF No. 33-4; Am. Compl. ¶13,

2

ECF No. 5).  In the late evening of May 1, 2017, Priddy was struck by a vehicle on the shoulder of I-69. (Priddy Dep. at 58).

The story begins a day earlier in Middleton, Ohio when Combine dispatched Priddy to deliver a load to Middleton and pick up a new load for eventual delivery to LaPorte, Indiana. After picking up the new load, Priddy returned to Indiana in the early morning hours of May 1, 2017. He parked his semi-tractor and trailer at the Marathon truck stop in Waterloo, Indiana, as was his regular practice when he was off duty. (*Id.*) Priddy, now off-duty, left the load at the truck stop and drove home in his personal vehicle, a Ford F150 pickup. Priddy testified that when he returned his truck to Waterloo, he would mark himself off-duty "because that's where the truck stops." (*Id.* at 70.)

Later that evening, Priddy returned to the Marathon in his F150 with the intention of delivering his load to LaPorte, as Combined requested him to do. When Priddy arrived at his truck he was "on duty." (Priddy Dep. at 70: "From the time I get to my tractor and do my pre-trip, the minute I show at my truck there's a 15 minute window that you have to do a pre-trip, start your truck, let it air up, check your lights, check your tires. So the minute I get to my truck starts my day.") Priddy completed a routine pre-trip inspection of his truck and, while doing so, realized he had forgotten his briefcase which contained his personal effects in addition to load paperwork, such as his logbook and overweight permits.[1] According to Priddy, "[i]f I get caught without a permit I'm in big trouble. I can lose my license." (Priddy Dep. at 76; see also *id.* at 80, referencing

---

[1] Overweight permits dictate the roads a driver is permitted to take with an overweight load. (Priddy Dep. at 58, 75.) The Marathon truck stop where Priddy routinely parked his tractor/trailer was part of his permit route. (*Id.* at 64.) Priddy's home was not.

the permits and stating, "I can't – you can't move without that stuff.").[2] Priddy then left the tractor-trailer running, returned to his F150, and proceeded to drive toward his home in Garrett, Indiana to retrieve his briefcase.

Priddy was driving southbound on Interstate 69 when he observed a vehicle in front of him traveling slowly and erratically. He passed the driver and proceeded southbound on I-69. After he passed the driver, he noticed a police officer in the grass median of the highway. He slowed his vehicle, pulled over to the shoulder on the right side of the road, and exited his vehicle. As he was standing on the side of the road attempting to flag down the police officer, he was struck by the erratic driver, sustaining injuries to his legs, head, eyes, and back. (Priddy Dep. at 100).

### B. **The Policy**

ASIC issued a group policy of Occupational Accident Insurance to policyholder Rediehs Freightlines, Inc. ("Rediehs") and its subsidiary and affiliated companies, including Combined under Policy Number 216-000261, hereafter "the Policy" (Decl. of Larry Wagner ¶ 5, ECF No. 33-3). Under the Policy, independent contractors of Rediehs and Combined could enroll for Policy coverage. (*Id.* ¶ 6). Priddy enrolled in coverage under the Policy through Combined prior to May 1, 2017. (Wagner Decl. ¶ 6).

The Policy contains basic coverage provisions and definitions addressing who is eligible to become an Insured Person under the Policy:

**ELIGIBILITY**
**You** are eligible to become an **Insured Person** provided **You** are at least eighteen (18) years of age, under **Dispatch** (i.e. **Actively at Work**), have completed enrollment material on file with the **Policyholder**, if required, and **You** are:

**Class I:**

---

[2] The Court takes judicial notice of Ind. Code § 9-20-6-11(a) which requires permits issued pursuant to that chapter to: (1) be carried in or on the vehicle or other object to which the permit refers; and (2) be open to inspection by a police officer.

An **Actively at Work Owner-Operator** who is enrolled for coverage under the **Policy**. …

(ECF No. 33-3, at 9)(emphasis in original).

The Policy further defines its terminology in Section IX:

**Actively At Work** means that **You** are under **Dispatch** an average of thirty (30) hours each week.

***

**Dispatch** means when **You** are:

**1**. in route to pick up a load;
**2**. picking up a load;
**3**. in route to deliver a load;
**4**. unloading a load;
**5**. in route after dropping off a load;
**6**. waiting for a load if **You** are not at home;
**7**. required to perform services by or for a motor carrier; or
**8**. performing activities to comply with federal or state laws to satisfy motor carrier or commercial driving requirements.

**Dispatch** must be authorized by the **Policyholder**. **Dispatch** does not include an **Injury** during usual travel between, to, and from work or a bona fide leave of absence or vacation.

(ECF No. 33-3 at 25–26).

The Policy further contains the following relevant claim provisions in Section VII:

**Claim Forms**. We will send the claimant Proof of Loss (claim) forms within fifteen (15) days after **We** receive notice….

**Proof of Loss**. Written Proof of Loss, acceptable to Us, must be sent within ninety (90) days of the date of the loss….**We** have the right to investigate the Proof of Loss and any relevant documents which **You** will make available to **Us** upon request.

 (ECF No. 33-3 at 23).

### C.  <u>The Claim</u>

On May 2, 2017, ASIC received an initial loss notice regarding Priddy's injury. (Wagner

Decl. ¶ 7.) Brentwood is the claims administrator for ASIC and administered claims under the

Policy. Brentwood assigned Priddy's claim to Senior Claims Adjuster Amberly Clemons. (*Id.* ¶10.) On May 2, 2017, Clemons sent correspondence to Priddy confirming receipt of the loss notice and requesting a completed Proof of Loss/Claim Form along with a blank form. (ECF No. 33-3, pp. 34–45.) On May 10, 2017, Clemons sent Priddy the first Reservation of Rights letter setting forth the various grounds for reserving rights under the Policy and requesting certain documents and information. (*Id.* pp. 46–8.) This information was sent to Priddy's home address. However, Priddy was admitted to the hospital for ninety days and did not receive the Proof of Loss/Claim Form.

On May 11, 2017, a private investigator hired by the Defendants interviewed Priddy while he was recovering at the hospital. On May 16, 2017, Clemons sent follow-up correspondence to Priddy, again to his residence, repeating the request for the completed Proof of Loss/Claim Form and outlining the Proof of Loss provisions in the Policy. (ECF No. 33-3, pp. 49–50.)

On May 23, 2017, Clemons received a letter of representation from Priddy's counsel and began directing all correspondence to counsel. Counsel obtained a copy of the Proof of Loss/Claim Form and submitted it to Brentwood on June 21, 2017, as well as a signed medical authorization form. The Proof of Loss/Claim Form, however, was not signed by Priddy. Further, Priddy testified that he had never seen the form. (Priddy Dep. at 34). Clemons, in turn, forwarded to counsel the police report of the accident Brentwood had obtained.

Thereafter, Clemons sent Reservation of Rights Letters to Priddy on May 24, 2017, June 21, 2017, June 26, 2017, July 25, 2017, August 8, 2017, August 30, 2017 and October 2, 2017. Each of these letters stated that there was a question as to whether Priddy was "under dispatch," as defined by the Policy, requested a completed and signed Proof of Loss/claim form, a statement from Priddy "regarding the facts of loss and injuries," as well as additional documents for

Brentwood to determine coverage. (*See generally,* ECF No. 33-3). On August 14, 2017, Priddy, through counsel, refused to provide a recorded statement and has not, to date, provided such a statement. However, nowhere in the Policy or in the reservation of rights letter sent to Priddy was Priddy asked or required to provide a *recorded* statement.

To date, the Defendants have made no coverage determination as they contend Priddy has failed to comply with the claim provisions.

### D.  Other Coverages and Facts Pertinent Thereto

The Policy provides additional benefits including Accidental Dismemberment ("AD") and Continuous Total Disability ("CTD") Benefits. In relevant part, the AD Benefit provides as follows:

> If **Injury** to **You** results in any one of the **Covered Losses** specified below, within the **Accident Commencement Period** shown in the **Schedule**, **We** will pay the Percentage of the **Principal Sum** indicated below.

> \*\*\*

> For purposes of the **Accidental** Dismemberment Benefit, **Loss** will mean:

> **Loss** of a hand or foot means complete severance through or above the wrist or ankle joint. **Loss** of sight of an eye means total and irrecoverable loss of the entire sight in that eye. **Loss** of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.

(ECF No. 33-3 at 13). The Accident Commencement Period for AD claims is found in Section II of the Policy and provides that the injury must occur within 365 days from the date of the injury. (ECF No. 33-3 at 11).

The Policy contains the following relevant provisions regarding the CTD Benefit:

> If a **Covered Injury** to **You** resulting in **Temporary Total Disability**, subsequently results in **Continuous Total Disability**, **We** will pay the **Continuous Total Disability** Benefit specified below, provided:

> \*\*\*

7

**3.** **You** have been granted a Social Security Disability Award for **Your** disability (If **You** cannot meet the credit requirement for a Social Security Award, **You** cannot qualify for the **Continuous Total Disability** Benefit even if **You** would otherwise qualify);

\*\*\*

E. **Sunset Period:** If **You** are not granted a Social Security Award for **Your** disability within two (2) years of the **Injury, You** cannot qualify for a **Continuous Total Disability** Benefit even if **You** would otherwise qualify.

(ECF No. 33-3 at 16–17).

Since his accident, Priddy has reported vision changes to his right eye and described his vision in that eye as similar to "looking through a straw." (Priddy Dep. at 22). Despite this vision impairment, Priddy can still drive his personal vehicle and passed an Indiana BMV vision test. (*Id.*) Priddy has no vision restrictions on his license and does not require contacts or glasses to drive. Priddy no longer has his commercial driver's license and states that he knew he would not be able to pass the required physical exam. He testified that his vision issues are "constant" and that he sometimes has to close his eye to read. (*Id.* at 109). However, when asked if any of his doctors told him that he should not drive a commercial vehicle due to his vision, Priddy responded "no." (*Id.* at 24).

Priddy submitted an application for Social Security Disability Insurance ("SSDI") benefits in April 2019. (Priddy Dep. at 41; ECF No. 37-9). He was denied these benefits. However, Priddy did receive a Supplemental Security Income ("SSI") award in September 2019, retroactive to May 2019. (ECF No. 37-9).[3] ASIC and Brentwood were not provided with any Social Security awards

---

[3]The factual record could certainly be clearer as to the Social Security filings Priddy actually made and when he made them. The confusion is compounded by Plaintiff's counsel's word choice, which is at odds with Social Security terminology. Counsel states:

> Kenneth was initially denied disability, but granted SSI benefits. Kenneth applied for Social Security Disability in or around April of 2019, but did not receive the denial until later that year. Kenneth then went through the process of appealing the decision after

regarding Priddy within two years of his injury, which would have been May 1, 2019. (Wagner Decl. ¶ 24).

Based on the above facts, Priddy filed his Amended Complaint (ECF No. 5), asserting claims of breach of contract, negligence, and breach of the duty of good faith and fair dealing. Along with compensatory damages, Priddy seeks punitive damages and attorney fees.

### DISCUSSION[4]

Defendants move for summary judgment on each of the Plaintiff's claims. Defendants assert that they did not breach their insurance contract because: (1) the Policy affords no coverage for Priddy's injuries since he was not "under dispatch" at the time of his injury, and (2) they owe no coverage because Priddy failed to comply with conditions precedent to coverage, namely submitting a signed and completed proof of loss form. With respect to the insurers' duty of good faith and fair dealing, the Defendants argue that there is no evidence that they acted with a dishonest purpose, unreasonably delayed Plaintiff's claim, or engaged in any claim handling conduct in bad faith. Finally, the Defendants assert they are entitled to summary judgment on Plaintiff's negligent administration claim since Indiana law fails to recognize such a cause of action.

---

providing more tax paperwork. Kenneth was granted disability retroactively from May 2019 onward.

(Resp. Br. at 13). However, the Notice of Award submitted by Plaintiff indicates that Plaintiff was awarded Supplemental Security Income or SSI benefits *not* Social Security Disability Benefits or SSDI benefits. (ECF No. 37-9).

[4]This Court has jurisdiction over this matter based on the diversity of citizenship of the parties and an amount in controversy in excess of $75,000, exclusive of interests and costs, pursuant to 28 U.S.C. § 1332(a). Plaintiff is a citizen of Indiana, and the Defendant entities are citizens of New York, Minnesota, and Tennessee. (Am. Compl. ¶5, ECF No. 5).

Alternatively, if the Court concludes that Priddy was "under dispatch" and that the Policy affords coverage, the Defendants seek partial summary judgment on whether Priddy is entitled to the additional Accidental Dismemberment and Continuous Total Disability benefits provided for in the Policy.

### I.     Breach of Contract

#### a.     "Under Dispatch"

Under Indiana law,[5] the construction of a written contract is generally a question of law for which summary judgment is "particularly appropriate." *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 354 (Ind. Ct. App. 1995). In Indiana, insurance contracts are governed by the same rules of construction as other contracts. *Wellpoint, Inc. v. Nat'l Union Fire Ins. Co.,* 952 N.E.2d 254, 258 (Ind. Ct. App. 2011), *reh'g denied*, *trans. denied.* If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Id.* An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. *Id.* Rather, an insurance policy is ambiguous if reasonable people may honestly differ as to the meaning of the policy language. *Id.*

 In this case, the parties are in agreement that the Policy language at issue is straightforward, unambiguous and that it can be construed as written. Their sole quibble is with the application of the facts to the Policy language with the Plaintiff, unsurprisingly, vying for an interpretation in favor of coverage and the Defendant, no less surprisingly, seeking an interpretation against coverage. To their respective ends, the parties' dispute focuses squarely on

---

[5]Under the doctrine espoused in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, a federal court sitting in a diversity action is bound to apply the substantive law of the state which provides the rule of decision in addressing plaintiff's claims. Neither party disputes the applicability of Indiana law in this case.

whether Priddy was "under dispatch" when the accident occurred. Priddy contends he falls within the Policy definition of "under dispatch" because he was conducting required activities on Combine's behalf to comply with federal or state laws at the time he sustained his injuries. The Defendants urge that Priddy was not engaged in activities in furtherance of a business purpose but that he was on a personal errand in his personal vehicle to retrieve personal items at the time of the accident.

Beginning with the Policy language itself, it lists eight activities which affirmatively qualify an insured as "under Dispatch."[6] There is no argument that the first six of those activities involve scenarios not applicable in any way to the facts here.[7] What remains hotly contested are the last two activities and whether at the time of his injuries Priddy was:

> **7**. required to perform services by or for a motor carrier; or
> **8**. performing activities to comply with federal or state laws to satisfy motor carrier or commercial driving requirements.

(ECF No. 33-3 at 25–26).

Priddy asserts that under the plain and ordinary meaning of either of these last two definitions, his activities qualify him as being "under dispatch." He points to the undisputed facts that he had arrived in Waterloo, was "on-duty," and had begun his pre-trip inspection. Only then did he realize he had forgotten required permits – permits that Defendants do not dispute are

---

[6] Priddy argues that he was "dispatched" by Combine on the evening of May 1 in the general sense of the trucking term, meaning that he was being "sent" by Combine on an official business endeavor when he arrived at his tractor-trailer. This fact is not disputed by the Defendants. But, use of this general terminology, even with undisputed facts attached to it, has little import in determining whether Priddy qualifies as being "under dispatch" in the insurance context as that term is defined in the Policy.

[7] These first six activities are those in which the insured is either driving the tractor-trailer, delivering a load, or picking up a load or waiting (not at home) to complete any of the aforementioned activities.

required for him to comply with motor carrier laws.[8] Instead, Defendants argue that Priddy could not have been complying with motor carrier laws because he "was not in or near his semi-tractor at the time of his injury and nothing about his activity at the time of the injury was unique to a commercial truck driver."(ECF No. 40 at 5). Defendants go on to assert that the Policy's definition is "confined to the time when he is actually performing activities to comply with said laws." (*Id.*).

Given the parties' views that the Policy language is unambiguous, this Court's obligation is merely to interpret the language as written to determine whether coverage applies.  The power to interpret insurance contracts "does not extend to changing their terms, and [the court] will not give insurance policies an unreasonable construction to provide added coverage." *Adkins v. Vigilant Insurance Company*, 927 N.E.2d 385, 389. In other words, the Court may not extend coverage beyond that provided by the unambiguous language of the contract. *Sheehan Const. Co. v. Cont'l Cas. Co.,* 935 N.E.2d 160, 169 (Ind.), opinion adhered to as modified on reh'g, 938 N.E.2d 685 (Ind. 2010)." *Id.*

What is atypical in this case is that it is the insurer asking the Court to read terms into their own Policy so as to deny coverage rather than the insured doing so to accomplish the opposite result. Defendants, for instance, insist that because Priddy was not "in or near" the tractor/trailer at the time he was injured he does not qualify as "under dispatch" under the last two provisions. (ECF No. 40 at 5). Likewise, it argues that these provisions limit coverage to time frames where the insured is "actually complying" with the motor carrier laws not "taking steps to later comply

---

[8] Defendants do argue that the Plaintiff has not identified specifically which laws he was complying with at the time of his injury. However, the Defendants point to no obligation in any of its Policy provisions requiring Priddy to specifically identify motor carrier laws to which he was in compliance at the time of the injury nor do they seriously contest in any manner that having permits required by state and/or federal law are necessary to operate a tractor/trailer.

with the law." (*Id.*). Unfortunately for the Defendants, the Policy language speaks to neither of these instances.

The Defendants have pointed to no specific provisions in the Policy identifying a requirement that Priddy be "in or near" his rig at the time he is injured. While it is true that the first six provisions, arguably, require the insured to be "in or near" his tractor/trailer merely by virtue of the type of activity listed (i.e., picking up a load, delivering a load, loading or unloading), there is clearly no specific provision requiring proximity to the tractor/trailer to qualify Priddy as being "under dispatch." Instead, Defendants ask this Court to imply such a requirement because, in its view, that was the insurer's clear intent from the activities listed. The Court declines Defendants' invitation to rewrite the Policy.

In an unambiguous contract, the insurer's intent is conveyed by the written language in the insurance contract. By the very nature of the first six activities listed to define "under Dispatch," an insured could reasonably be said to have some proximity to or presence in the tractor/trailer. The final two provisions, however, reach a much broader array of activities. Indeed, this Court can fashion multiple scenarios where an insured might be conducting required activities for a motor carrier without being in any proximity to his tractor/trailer. This Court will not add language to the Policy that the insurer chose not to include. Nor is it the Court's obligation to rewrite the policy of insurance or read into the insurance contract that which is not there. *Zeller v. AAA Ins. Co.*, 40 N.E.3d 958, 962 (Ind. Ct. App. 2015) ("[W]e cannot rewrite the policy nor make a new or different policy, but must enforce the terms of the policy as agreed upon by the parties…"). Thus, the Court declines to insert a requirement that Priddy was required to be "in or near" the tractor/trailer as a precursor to finding that he was "under dispatch."

Similarly, the Court finds little support for the proposition that the Policy requires active engagement in complying with motor carrier laws at the time of the injury. Arguably, provision eight (8), is drafted in the present tense and might support such an interpretation. But this argument is not well-developed by counsel, if at all, and is therefore waived. *See, e.g.*, *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (internal quotations omitted)); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 511 (7th Cir. 2010) ("[I]t was not the district court's job to sift through the record and make Connor's case for him."); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material."). !

Moreover, this Court's decision can rest on other grounds. Provision seven (7), when read in tandem with provision eight (8), permits a determination that an insured is "under dispatch" if, at the time of his injury, he is "required to perform services by or for a motor carrier" or "performing activities" to satisfy commercial driving requirements. Priddy argues that the undisputed facts show he was assigned by Combined to deliver a load to LaPorte, Indiana.[9] As part of that assignment, Priddy was provided load paperwork required to lawfully complete this

---

[9] To support these assertions, Priddy cited to his own testimony as well as generally to the deposition of Linda Mason, an employee of Combined, from a companion suit involving UIM benefits. The Defendants filed a Motion to Strike this evidence as well as any reference to the deposition. The Motion to Strike is DENIED as MOOT. Priddy testified that he was assigned to deliver a load by Combined on the evening of the accident and that he left required paperwork at his home to complete that assignment. (Priddy Dep. at 73, 80). Defendants failed to dispute this evidence with any factual evidence of its own. Thus, as this Court must, it construes these facts favorably to the Plaintiff. This Court need not rely on the deposition of Linda Mason as Priddy's own testimony is sufficient on the issue.

task for Combined. At the time he was injured, Priddy was in route retrieving that paperwork. And, had Priddy not been required to have the paperwork, he would not have been driving to his residence to get it. Thus, in his view, he was engaged in activities required to perform services by or for a motor carrier. Defendants while not directly taking issue with the facts, respond, "[a]t best, Priddy was taking steps to later comply with unidentified state and federal law(s) *once he was back in his semi-tractor and on his permitted route*." (ECF No. 40 at 5) (emphasis in original).

In a policy dispute under Indiana law, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F.Supp.3d 1015, 1023 (N.D.Ind.2014) (citation omitted).  Looking at the undisputed facts, the Court concludes that Priddy has met his burden here and established that he is entitled to coverage under the Policy as he was "under dispatch" at the time of his injury. The Court lends little validation to the Defendants' argument that retrieving legally required paperwork (regardless of its location) to perform the job he was assigned to do for Combined and comply with motor carrier laws does not fall within the Policy's definition.[10]  This Court has already declined to read into the Policy a requirement that Priddy be "in or near" his tractor/trailer at the time of his injury and the Defendants' argument overlooks key factual issues to which there is no dispute. Priddy's testimony makes it clear that he was not on a personal errand entirely divorced from his required services for Combined. Indeed, he testified that the permits were required, (see also fn. 1 requiring motor carrier operators to possess permits and provide them to law enforcement), and that he

---

[10] Priddy had marked himself on-duty that evening when he arrived at his rig and began the pre-trip inspection. When he realized he did not have the required paperwork, he did not mark himself off-duty and then proceed home. Rather, he left the rig running, believing that he would make a quick trip to get the paperwork and continue with his assigned delivery.

"could not move" the rig without them. This is not a case where an insured was engaged in some independent "frolic or detour," *see Forkwar v. Empire Fire & Marine Ins.,* 487 F.App'x 775, 780 (4th Cir. 2012)(interpreting whether an insured was furthering the business interests of his contractor at the time of an accident) unrelated to the business interests of Combined and was injured. And while Defendant resists the argument that Priddy was required to have the overweight permits to legally operate the tractor/trailer, it offers no evidence to dispute Priddy's testimony. Accordingly, this Court concludes as a matter of law that Priddy was "under dispatch" as contemplated by the Policy at the time of his accident.

Once an insured proves that it has suffered a covered loss, the burden shifts to the insurer to show an exclusion applies. *Ports of Indiana v. Lexington Ins. Co.*, No. 1:09–cv–0854, 2011 WL 5523419, at *9 (S.D.Ind. Nov. 14, 2011). Here, the Defendants argue that the Policy excludes injuries sustained "during usual travel between, to, and from work…." To this end, the Defendants again rehash the fact that Priddy was in his personal vehicle driving to his home at the time of the accident.

What Defendants' discussion overlooks is that the Policy excludes "*usual* travel between, to, and from work." (emphasis added). The Policy itself does not define "usual" and thus, the Court may give the term its plain meaning. "Usual" is defined in Merriam Webster's Dictionary as "(1) accordant with usage, custom or habit: NORMAL; (2) commonly or ordinarily used; (3) found in ordinary practice or in the ordinary course of events: ORDINARY."[11] By all accounts, Priddy's decision to drive his personal vehicle home to retrieve the forgotten load paperwork was not in accordance with any custom, habit, or ordinary practice of Priddy's;  nor was it "usual" in the

---

[11] https://www.merriam-webster.com/dictionary/usual.

sense clearly intended by the plain meaning of the Policy language. The exclusion, by using the word "usual," excludes ordinary travel home and back to the work location by an insured. Typically, such travel would occur at times when an insured is off-duty from his shift or on his way to report for a shift. Thus, to the extent Priddy was traveling to or from his home or work as his common practice at the beginning or end of his workday, any injuries sustained would be excluded. But, as is clear, that is not this case. Priddy was on-duty and en route to retrieve necessary items to further the business interests of Combined. Accordingly, the Court concludes that the Defendants have not, as a matter of law, met their burden of demonstrating an applicable exclusion precludes coverage.

In sum, the Court concludes as a matter of law that Priddy was "under dispatch" at the time of his May 1, 2017 accident. The Court further concludes that the Defendants have not, as a matter of law, demonstrated any exclusions that would undermine coverage.

### b.  Claims Provisions

Next, Defendants assert that they cannot be liable to Priddy for breach of contract as a matter of law because Priddy was non-compliant with the Policy requirements that he submit a signed and completed Proof of Loss claim form. Under Indiana law "[w]here a policy provides for notice and proof of loss within a stated period, the insured must comply with that provision as a condition precedent to recovery under the policy." *Ebert v. Grain Dealers Mutual Ins. Co.*, 303 N.E.2d 693, 700 (Ind.Ct.App. 1973). Defendants correctly point out that the Policy mandates that an insured provide proof of loss within 90 days of the loss and, they likewise point out, and Priddy does not dispute it, that he has never submitted a *signed* Proof of Loss claim form.

That is not to say, that Priddy failed altogether to submit a Proof of Loss claim form. In his defense, Priddy invokes the doctrine of substantial compliance and argues that the doctrine excuses

his otherwise minimal faulty compliance. He argues that he complied with his duty to provide a timely Proof of Loss form, albeit unsigned, within 90 days of the loss. (ECF No. 33-3 at 57–62). Indeed, the facts reflect that on June 21, 2017, Priddy's counsel submitted the unsigned Proof of Loss claim form on his behalf.[12] However, the form does include answers to requested information in all areas including, claimant information, policyholder/truck information, accident information, injury information, healthcare provider information, prior medical history, and information on current short term disability benefits Priddy was receiving. Other than Priddy's signature, the only information absent from the form is Priddy's prior physician treatment over the past ten years and his education/work experience. In addition to the form, however, Priddy did send signed medical authorization forms for the Defendants to obtain treatment records. (Wagner Decl. ¶ 23). Priddy also provided 1099 tax forms from 2016, as requested, and provided a statement to Defendants' investigator while he was hospitalized.[13] This, he believes constitutes substantial compliance which, he contends, is all that Indiana law requires. See *Indiana Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1089 (Ind. Ct.App. 1992).[14]

In *Ebert,* the Indiana Court of Appeals held that a proof of loss form is a condition precedent to an insured's recovery under a policy. It did not stop there, however; it also set forth an exception, "the insured may show a waiver of that condition by the insurer or a substantial

---

[12] Priddy's counsel represents in his brief that he filled out the form on Priddy's behalf during a telephone consultation while Priddy was hospitalized. (ECF No. 36 at 19).

[13] The Defendants reference throughout their briefing that Priddy refused to submit to a recorded statement. However, nowhere in the Policy nor in the reservation of rights documentation sent to Priddy did Defendants request or require Priddy's submission to a recorded statement. The Defendants also do not dispute that their investigator did take a statement from Priddy while he was hospitalized from his injuries.

[14] Given that he provided all this information, Priddy characterizes Defendants argument that he failed to comply with the Policy condition to provide a signed Proof of Loss form as "farcical." (ECF No. 36, at 20).

compliance on his part with the condition." *Ebert,* 303 N.E.2d at 700. The Seventh Circuit has acknowledged the doctrine (or something akin to it) on a few occasions, most recently noting that "[t]he substantial compliance doctrine makes good sense: a rule requiring strict compliance with the fine print buried in an insurance contract could result too easily in unintended forfeitures, which are anathema to the law." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.,* 849 F.3d 355, 365 (7th Cir. 2017); see also *Republic-Franklin Ins. Co. v. Silcox,* 92 F.3d 602, 604 (7th Cir. 1996) (discussing when an "excusable breach" of a condition precedent exists).

In *Silcox,* an automobile and homeowners' liability insurer brought a declaratory judgment action against its insureds and accident victims asserting that the insureds breached the duty to notify it of an accident and the insurer, therefore, owed no duty to indemnify the insureds. The Seventh Circuit, analyzing Indiana law, noted that, "[f]ulfillment of the duty of prompt notice is … a condition precedent to the insurer's duty to indemnify." *Silcox*, 92 F.3d at 604 (quoting *Miller v. Dilts,* 463 N.E.2d 257, 260–61 (Ind.1984)). The court went on to discuss the policy rationale behind the requirement that prompt notice be given, specifically stating that, "[i]n ordinary circumstances, notice should follow the accident almost immediately so that the insurer can begin collecting evidence and negotiating...[but] tardy notice poses no problem for the insurer if the insurer would not have received any benefit from earlier notice." *Id.* With respect to a court's obligation when presented with this issue, the court held:

> A court may conclude that the absence of injury to the insurer constitutes no breach at all because the insured acted reasonably; or it might conclude that late notice constitutes an excusable breach because the insurer was not prejudiced. *Compare Ohio Casualty,* 507 F.2d at 578–79 with *Miller,* 463 N.E.2d at 265–66. But in either event, the court would rely on the same principle. The provision of notice fulfills the duty to notify when it enables the insurer to do everything that a reasonable person would do to diminish the risk of liability.

*Silcox*, 92 F.3d 602, 604 (7th Cir. 1996).

Priddy seemingly falls head first into the *Silcox* argument, albeit without any intention of doing so in his brief. He argues that the Defendants have failed to demonstrate any prejudice from the absence of a signature on the Proof of Loss claim form. He notes that there is no question the Defendants received timely notice of his claim; the Defendants have not alleged any delay occasioned by the absence of the signature alone; and, they have not claimed an inability to investigate or make a determination of coverage as a result of his non-compliance. Thus, he contends that he has fulfilled his contractual requirement through substantial compliance.

For their part, the Defendants altogether fail to address any prejudice to them by the absence of Priddy's signature on the form. Instead, they hang their hat on case law interpreting other types of insurance clauses, none of which are present in this case. *See Morris v. Economy Fire and Cas.Co.,* 848 N.E.2d 663, 667 (Ind. 2006) (examining insured's refusal to comply with contractual provision requiring an examination under oath); *Foster v. State Farm Fire & Cas. Co.*, 674 F.3d 663 (7th Cir. 2012) (holding insured's failure to provide documents required to complete examination under oath contractual provision is a breach). Given that the Policy at issue does not include a requirement that Priddy submit to an examination under oath, the court's findings in those cases are not controlling.

This Court's review of the record along with the holding in *Silcox* leads the Court to the conclusion that Priddy substantially complied with the requirement that he provide a Proof of Loss claim form within 90 days. While *Silcox*'s holding is more directly related to an insured's notice requirement, the Proof of Loss/Claim form here fulfills a similar role in putting an insurer on notice of the scope of the claim. As was articulated in *Silcox*, Priddy's Proof of Loss form provided the required notice to enable the Defendants to proceed with claim processing. Indeed, the Defendants have not alleged anywhere in their briefs that the absence of Priddy's signature on the Proof of

Loss form prejudiced their ability to make an informed coverage decision or proceed with an investigation of the claim. Accordingly, the Court concludes that Priddy substantially complied with the claims requirement that he supply a signed Proof of Loss form.

### c. Accidental Dismemberment Coverage

Because the Court has concluded as a matter of law that Priddy was "under dispatch" as contemplated in the Policy, Priddy may be eligible for the additional benefit of AD Coverage if he can meet the eligibility requirements under the Policy. Defendants have moved for partial summary judgment asserting that because the undisputed facts demonstrate that Priddy did not suffer a "total and irrevocable loss" of the entire sight in his right eye within 365 days of the accident, he is not eligible for this coverage.

The Policy provides for a lump sum benefit for the loss of sight in a single eye, but only under certain conditions. Those conditions are identified in the Policy and require: (1) total and irrevocable loss of the entire sight in that eye; and (2) the loss must occur within 365 days of the injury. (ECF No. 33-3 at 11, 14). Priddy makes a cursory argument that he is entitled to AD coverage. He points to facts that his eyesight was severely impaired and that in a deposition in a related, but completely different lawsuit, involving a different insurer,[15] he testified that he had a complete loss of vision in his right eye. However, as Defendants point out in *this* lawsuit, Priddy testified in his September 24, 2019 deposition, well beyond the 365 day commencement period, that he could see out of his right eye (albeit not well), had passed a vision test at the BMV, obtained

---

[15] Defendants have moved to strike this testimony along with the deposition testimony of Linda Mason which is also from a secondary suit arising from this accident. As previously noted, the Motion to Strike is DENIED as MOOT as the Court has not relied on any of the testimony from the secondary suit in resolving the issues herein, and even if the Court had, the results would not change.

a valid driver's license, and did not have any vision restrictions on his license. (Priddy Dep. at 22–23).

Priddy does not dispute any of these facts other than to say at some later date, a date even farther beyond the 365 days commencement period, he suffered a total and irrevocable loss of sight.[16] Similarly, he appears ignorant of the Policy requirement that the vision loss must have occurred within 365 days of the loss. Rather, he focuses on whether he lost his sight "as a result of the accident." (ECF No. 36 at 22). Given this state of the record, the Court concludes that Priddy is not eligible for AD benefits under the Policy and the Defendant's Motion for Partial Summary Judgment on this claim is GRANTED.

### d. Continuous Total Disability Coverage

For similar reasons, Priddy does not fare much better in his quest for CTD benefits. The Policy contains a sunset period for CTD benefits expressly stating:

> If **You** are not granted a Social Security Award for **Your** disability within (2) years of the **Injury**, **You** cannot qualify for a **Continuous Total Disability** Benefit even if **You** would otherwise qualify.

Thus, to qualify for CTD benefits, Priddy must have been granted a social security award for his disability by May 1, 2019, two years from his injury.

Priddy asserts that he is entitled to these benefits because he *applied* for them within the two year period. He points out that he applied for Social Security Disability in April 2019, and that he was initially denied those benefits. However, he states he was eventually awarded disability benefits retroactive to a time within the two year period. But this is a mischaracterization of the

---

[16]Priddy's Deposition in the secondary suit was taken on February 13, 2020, nearly 3 years since the accident in this case.

record. Priddy did apply for SSDI benefits and was denied. He was awarded SSI benefits in September 2019 retroactive to May 2019. This is a distinction that makes a difference in this case.[17]

Aside from the sunset period, eligibility requirements for CTD benefits under the Policy state that to qualify an insured must have been granted a "Social Security Disability" award. (ECF No. 33-3 at 16–17). The Policy specifically indicates that "if **You** cannot meet the credit requirement for a social security award, **You** cannot qualify for the **Continuous Total Disability** Benefit even if **You** would otherwise qualify" (*Id.* at 17). Here, because Priddy was awarded SSI benefits rather than SSDI benefits he is not eligible under the CTD Policy provisions. Accordingly, the Court concludes that Priddy is not eligible for CTD benefits and the Defendants' Motion for Partial Summary judgment on this claim is GRANTED.

## II.      Duty of Good Faith and Fair Dealing

With the coverage issues resolved, the Court moves next to Priddy's claim that the Defendants slow-walked his claim thereby breaching the insured's duty of good faith and fair dealing. Indiana has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518 (Ind. 1993).

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Id.* at 519. Proving bad faith amounts to showing more than bad judgment or negligence: "it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.... [I]t

---

[17] SSDI is available to workers who have accumulated a sufficient number of work credits, while SSI disability benefits are available to low-income individuals who have either never worked or who have not earned enough work credits to qualify for SSDI. They are two completely separate government programs.

contemplates a state of mind affirmatively operating with furtive design or ill will." *Oxendine v. Pub. Serv. Co. of Ind., Inc.*, 423 N.E.2d 612, 620 (Ind. Ct. App. 1980).

The Defendants assert that there is a complete absence of factual evidence from which a reasonable juror could conclude that they breached a duty of good faith and fair dealing owed to Priddy. They assert that they had a legitimate coverage dispute as well as a genuine dispute as to whether Priddy complied with the claims provisions in the Policy. Based on this, the Defendants point to well-established Indiana jurisprudence that a good faith dispute about coverage or the amount of a claim does not supply grounds for recovery in tort for the breach of the obligation to exercise good faith. *See Hickman*, 622 N.E.2d at 520; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) ("To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability.").

The crux of Priddy's response is the same as his arguments related to the other issues raised at summary judgment namely, that the Defendants have never accepted or denied his claim, Priddy substantially complied with all requests, and that he was "under dispatch" and covered under the Policy. What all these arguments lack, however, is any evidence that the Defendants acted with a dishonest purpose or some other nefarious motive. Even if a court determines that the insurer breached the policy, this alone does not make the insurer liable in tort for bad faith. *Hickman,* 622 N.E2d.at 520. Rather, an additional element of wrongdoing must also be present. *Colley v. Indiana Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind.Ct.App.1998). In this case, Priddy has pointed to nothing in the record which smacks of the type of wrongdoing required for this claim to proceed further. Moreover, while Priddy contends that the Defendants "slow-walked" his claim and made an unfounded refusal to accept or deny the claim, the undisputed facts fail to support

this assertion as there was a good-faith dispute over coverage. Accordingly, the Defendant's Motion for Summary Judgment on this claim is GRANTED.

### III.    Negligent Representation

This brings the Court to Priddy's final claim, that is that Brentwood, as a claims administrator, negligently administered his claim. Defendants move for summary judgment asserting that Indiana does not recognize this cause of action.

The parties have framed this claim as one relying on principles of agency. Both parties cite to *Troxell v. Am. States Ins. Co.*, 596 N.E.2d 921, 925 fn. 1 (Ind. Ct. App. 1992) but reach different conclusions about the nature of its holding and its applicability here. Priddy recites *Troxell's* general holding that an action may be brought in contract or in tort for the negligent performance of a contractual duty, but neglects to discuss its conclusion, which Defendants swiftly point out, that insurance adjusters have no general duty to represent the insured's interests. *Id.* at 925 fn. 1; see also, *Lodholtz v. York Risk Serv. Grp, Inc.,* 778 F.3d 635, 645 (7th Cir. 2015) (finding that under Indiana law as predicted by a review of Indiana Court of Appeals decisions, claim adjusters did not owe a legal duty to insureds).

While Priddy is correct as to one of the general principles espoused in *Troxell*, that general principle is inapplicable here. *Troxell* and *Lodholtz* make clear the proposition that individual claim adjusters do not owe a duty of care the insured, and therefore cannot be held liable to the insured for negligence as a matter of law. Indeed, *Troxell* holds that an insurance adjuster, as an agent of the insurance company, has no direct relationship to the insured and does not owe the insured a duty of care. This conclusion is consistent with other Indiana law holding that tortious bad faith claims may not be asserted against an agent, independent adjuster, or independent adjusting company, *see Cochran v. Hartford Fire Ins. Co.,* No. 3:14-CV00022-RLY-WGH, 2015

WL 13636677, at *1 (S.D. Ind. Jan. 26, 2015); *Schwartz v. State Farm Mut'l Auto. Ins. Co.*, 174 F.3d 875, 878 (7th Cir. 1999), nor may a claim for breach of an insurance contract be brought against an agent, independent adjuster, or independent adjusting company. *Cochran,* 2015 WL 13636677, at *1. Accordingly, the Court concludes that Defendant's Motion for Summary Judgment on this claim is GRANTED.[18]

## CONCLUSION

Based on the foregoing, the Defendants' Motion for Summary Judgment (ECF No. 31) is DENIED in part and GRANTED in part. The Motion is DENIED as to Plaintiff's claim for breach of contract relating to eligibility for coverage under the Policy. The Court concludes as a matter of law that Plaintiff was, in fact, "under dispatch" at the time of the accident as the term is defined in the Policy and that he substantially complied with the claims provisions, thereby making him eligible for coverage under the Policy. The Court, *sua sponte*, finds that there is no genuine dispute of fact on these issues and Plaintiff is GRANTED summary judgment on those issues. Defendant's Motion for Summary Judgment is GRANTED as to all remaining breach of contract issues and all other claims. The Defendants' Motion to Strike (ECF No. 41) is DENIED as MOOT.   The Defendants' Motion for Oral Argument (ECF No. 43) is DENIED.

SO ORDERED on June 24, 2020.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[18] In contrast, Indiana permits certain claims against a third-party administrator. *See Sieveking v. Reliastar Life Ins. Co.,* No. 4:08-cv-0045-DFH-WGH, 2009 WL 1795090, at *2 (S.D.Ind. June 23, 2009) (third-party administrator can be liable to the plaintiff for bad faith, even if it was not a party to the underlying insurance contract). In this case, the parties have not identified Brentwood as a third-party administrator and neither party asserts that a negligence claim is valid against a third-party administrator. Thus, the Court has no occasion to consider the issue.